UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 04-11192-NMG

Eric Kelley,
Plaintiff, Pro Se

v.

Sheriff DiPaola, Superintendent Norton,
Officer Thurman Hall, Sgt. Joseph Flynn,
Billerica House of Correction Legal Dept.,
Attorney Lee Gartenberg, Attorney John
Goggin, Commissioner of the Massachusetts
Board of Health, Commissioner of Public
Safety, and Billerica Board of Health,
Defendants.

Plaintiffs Motion To Amend and Add New defendants For further Violations.
1) Placement in A Prison (Punishment) Setting
a) Denial Of Access to the court, Right to Defend & fair Trial.

Now comes, The Plaintiff in the above matter and requests that Summons be Presented for the following defendants (Amended);
1) Sheriff Andrea Cabral of Suffolk County
2) Karen Dinaddo (M.C.I. Concord)
3) Carol Lawton (MCI old Colony Corr. Center)
4) Diane Silva (Classification Dir. D.O.C.)
5) University of Mass. Medical Center.
6)  Sgt. Boston Crowley

Attached is Statement of facts
Memorandum and exhibits.     Eric Kelley
Eric Kelley

Facts:

1) The defendant (Dipaola) through his agents, <as a state entity> threatned to send the Plaintiff to a state Prison while awaiting trial as a Pre trial detainee.

2) On March 31st 2005 the defendants sent Plaintiff to Suffolk County (nausha St)

3) The Plaintiff is & was representing himself in his criminal matter.

4) Nausha St. (Sheriff Cabral) locked Plaintiff in a segregated unit for 4 days. He continually requested to see mental(health) but was told they had no mental health staff. (Plaintiff felt suicidal and was hearing voices under tremendous stress.)

facts (cont.)

5) Nausha St. Jail sent plaintiff to M.C.I. Concord State Prison. (Regardless of plaintiffs federal court injunction (pending) pleading / See Exhibit A & B Near-attached.

6) Upon arrival at MCI Concord Sgt. ~~Foley~~ Crowley (who Plaintiff formerly sued for assault) Took all of Plaintiffs legal documents, and said "you'll get them back in 3 or 4 days". Confiscation) of legal documents are impermissable. (a 10-20 minute search of documents would of secured any security interest.)

7) ~~Foley~~ Crowley immediately Placed the plaintiff in cuffs and had him taken to Solitary when Plaintiff requested to "see a captain".

Facts (continued)

8) In confinement Plaintiff received no shower, Phone call or library access for 4 days.

9) Plaintiff requested mental health treatment and Medication (he was denied) (2 mass medical)

10) Plaintiff requested Law Library access (he was denied)

11) Plaintiff requested writing materials (He was denied) (cut access)

12) Plaintiff spoke to Karen Dinaddo of classification. (She said; "Your gonna Pay Kelley")

13) Dinardo had plaintiff transferred to a maxium Security Prison) (old Colony Correction Center)

facts (cont.)

14) Dinardo placed Kelley in a maxium security Prison with a "Known" "documented" enemy (even though she knew or should of known he was there) It was on her classification computer. Dinnaddo tried to have the Plaintiff seriously harmed, she was deliberately indifference to Plaintiffs safety.

15) Carol Lawton OCCC classification (classifier) had the Plaintiff sent to SBCC super maxium security, in absence of any disciplinary infraction).

16) The Plaintiff was never given law library access, mental health treatment (his medication) or court access.

17) (OCCC) classification Director
Carol Lawton came to plaintiff's
Cell and stated; "you can do
all the legal stuff you want
inmate lawsuits never go anywhere
we are the Judges, we make the
rules and I'm sending you To
either the ("super max.") or to
walpole which will be good punishment
for you, "....

" Until you actually get hurt
nobody is taking your enemy
Claims seriously."

" Your being treated just any other
inmate who is Sentenced because
as long as you have a bail mitt
we consider you doing Time, your
being Sent to the highest Security based
on your Past history as a Sentenced
Convict" ......

Facts (continued)

18) On 4/18 the plaintiff had
an Attorney visit with Attorney
Steve Clark. Atty clark was there
in response to all the violations
the plaintiff was not being subjected
to. (Atty clark is not plaintiff's criminal
or civil attorney) but responded to
these allegations, violations, and
this attorney's (violations) (after confirmation)
Atty clark represents an advocate agency for Judge Banks.
19) Carol Lawton (Deputy of Classification)
Spoke with Atty clark and stated;
"If you refuse SBCC Super maximum
you'll be sent to Walpole classification
you don't have a (classification) maximum
for SBCC (As) we send them to any
prison without a screening process"
this was said in Atty. Clark's presence.

TO
Plaintiff

30) The Plaintiff warned Brockton the Hanson population without Protection amongst his noted documented enemies. Inmates made threatening statements. (he did this to get his duty board)

31) Plaintiff reserves the right to add additional violations because this is a continual Process.

Prayer for Relief

1) ~~Punative Damages~~ compensatory Damages, $10,000.00 — (Ten Thousand per day Plaintiff was in a Punishment setting State Prison in general Population.)

2) Allow Plaintiff previously filed Motion for Emergency (see Ex. A. attached)

3) Punative Damages $ 60,000 —
Sixty thousand

Eric Kelley (2005)

Conclusion

At the time of this writing the Plaintiff has gone:

1) 12 days w/o a shaver

2) 12 days w/o mental health treatment (medication)

3) 12 day w/o Law library access (as a Pro se criminal defendant)

4) 12 days w/o a Phone call.

5) 12 days w/o access to the courts.    And it is ongoing

Truthfully deposed

Eric Kelley

from: a Super maximum security Prison)
(while awaiting trial as a pretrial detainee and Pro se defendant)

Cause of Action

1) Denial of Law Library is
   unconstitutional
                        -See Bounds v. smith
                        Casey v. Lewis

2)  Punishment of a pretrial
    detainee under conditions
    conditions worse than State Prisoners
        Bell v. wolfish 441 U.S.
        99 S ct.

3)  Presumption of Innocence
    Due Process
    Equal Protection
    have all been violated

                    See Kelly
                    Proje CI

JAL

## PRISONERS' SELF-HELP LITIGATION MANUAL

s–to get a law-
e of, communi-
ssion, etc. The
hink it may be
ggerated their
ther communi-

ss to the courts.
xtensive law li-
 (incorrectly, in
al case is suffi-

ate punishment
an extended pe-
 jail conditions
litions may con-

104 (2d Cir. 1981).

e), cert. dismissed, 453
Pa. 1993); Young v.
t, 887 F.2d 1287 (6th
) and cert. denied sub
. Carver, 729 F.Supp.
, 685-88 (W.D.Tenn.
7, 1143-47 (W.D.Pa.
on other grounds, 110
ro v. Fulton County,
 County, 681 F.Supp.
olon, 697 F.Supp. 37,
.Supp. 1280, 1285-87
n. 1986); McMurry v.
ick, 527 F.Supp. 1252,
76, 1293-95 (W.D.Mo.
81); see also Lyons v.
ng on a floor mattress
state prison); Lock v.
held in a state prison

vernight confinement
rsons who had done
d "punishment"), cert.
1381, 1387 (11th Cir.)
food, no blankets or
m the elements other
e of cold air, together
endanger his health"),
752 F.Supp. 140, 141 n.

However, courts have not spelled out how the *Wolfish* punishment standard for detainees differs from the Eighth Amendment standard, which prohibits "unquestioned and serious deprivations of basic human needs" or denial of the "minimal civilized measure of life's necessities."[27]

It is ironic that detainees in local jails who have not been convicted of anything are often treated more harshly than state prisoners who have been convicted of serious crimes. Some courts have held that such treatment violates detainees' rights.[28] Others, however, have held that the constitution is not violated by harsher treatment of detainees if they are held by a different agency of government from state prisoners,[29] or that the length of stay or other aspects of confinement are sufficiently different to justify these differences in treatment.[30]

Memorandum

3 (S.D.N.Y. 1990) (confining detainees in non-housing areas and in areas without toilets was unconstitutional); Willis v. Bell, 726 F.Supp. 1118, 1122 (N.D.Ill. 1989) (allegation of 12 hours without food or access to a washroom after arrest stated a claim under the punishment standard if done intentionally).

Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392 (1981). This standard is discussed in Ch. II, § A.1.

One court has held that in an overcrowded jail, detainees could be double-celled for 15 days while convicts could be double-celled for 30 days. LaReau v. Manson, 651 F.2d 96, 105, 109 (2d Cir. 1981).

Another court has held that the legal standards are the same for detainees and convicts in conditions cases because to hold otherwise "would require courts to evaluate the details of slight differences in conditions" and would get courts involved in "minutiae" in jails that house both convicts and detainees. Hamm v. DeKalb County, 774 F.2d 1567, 1574 (11th Cir. 1985), cert. denied, 475 U.S. 1096 (1986); accord, Starks v. Bowles, 682 F.Supp. 891, 893 (N.D.Tex. 1988), aff'd, 851 F.2d 1419 (5th Cir. 1988). We think Hamm is wrong. The Supreme Court has not only stated different standards for the two groups; it has also recently emphasized, in establishing the legal rules for the use of force for arrestees, detainees, and convicts, that each group is protected by a different constitutional provision and has created different legal standards for each. Graham v. Connor, 490 U.S. 386, 393-94, 109 S.Ct. 1865 (1989). We think the same approach is applicable to conditions cases.

See, e.g., Rhem v. Malcolm, 507 F.2d at 336; Hamilton v. Love, 328 F.Supp. 1182, 1191 (E.D.Ark. 1971). One court has held that leaving convicts in local jails because of lack of space may deny them the equal protection of the laws. Hill v. Hutto, 537 F.Supp. 1185, 1189 (E.D.Va. 1982) (finding equal protection violation where state prisoners were backed up in local jail because of lack of state prison space). The Equal Protection Clause is discussed in Ch. V.

Dawson v. Kendrick, 527 F.Supp. at 1286. If convicts and detainees are held by the same agency of government, such differences do deny equal protection. Lock v. Jenkins, 641 F.2d at 497; Young v. Keohane, 809 F.Supp. at 1194.

Feeley v. Sampson, 570 F.2d 364, 371 (1st Cir. 1978).

Box C - Library

360 F.Supp. 676, Inmates of Suffolk County Jail v. Eisenstadt, (D.Mass. 1973)

Page 2

350HI(A) In General
350Hk4 Necessity of Conviction.

(Formerly 110k1205)

"Punishment" cannot be justified without a judicially determined finding of guilt; in other words, pretrial detainees may not be "punished" for crimes charged but not yet proved against them.

[4]        Prisons ☞17(2)

310 ----
310k17 Maintenance and Care of Prisoners
310k17(2) Medical and Mental Care.

(Formerly 310k17)

Conditions for pretrial detention must not only be equal to, but superior to, those permitted for prisoners serving sentences for the crimes they have committed against society.

[5]        Prisons ☞4(4)

310 ----
310k4 Regulation and Supervision
310k4(4) Persons Held Pending Trial or on Detainer.

(Formerly 310k13)



First test of the constitutional sufficiency of incarceration at county jail, the majority of whose inmates were pretrial detainees, rested on a comparison between the quality of that incarceration and the quality of the type of incarceration which the state designates as "punishment" in a correctional facility for convicts; and the second test of the constitutional sufficiency of the incarceration involved measuring the limitations on liberty of a detainee against the state's sole interest in presenting him for trial.

[6]        Constitutional Law ☞262

92 ----
92XII Due Process of Law
92k256 Criminal Prosecutions
92k262 Arrest, Bail, and Pretrial Detention.

[See headnote text below]

[6]        Prisons ☞4(4)

310 ----
310k4 Regulation and Supervision
310k4(4) Persons Held Pending Trial or on Detainer.

(Formerly 310k13)

[See headnote text below]

[6]        Prisons ☞17(1)

310 ----

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

641 F.2d 488, Lock v. Jenkins, (C.A.7 (Ind.) 1981)

prison maintained primarily for the purpose of punishment of convicted persons, under conditions more burdensome than those imposed on the general population of convicted felons, amounts to punishment under Bell v. Wolfish. In Wolfish, the Court noted that "there is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates," and that in fact the detainees accused of serious crimes might constitute more serious risks than convicted inmates serving short terms. 441 U.S. at 546 n.28, 99 S.Ct. at 1878 n.28. Here on the contrary, the safekeepers are held at a maximum security prison, housing primarily felons including many serving sentences for life or for a long term of years. Granting that the state's interest in secure confinement of the safekeepers may justify confinement of particular detainees under restricted conditions because of their known characteristics, the additional severity of treatment in the absence of knowledge of their individual characteristics is clearly excessive and thus amounts to punishment under the Wolfish test. 441 U.S. at 538-39, 561, 99 S.Ct. at 1873-74, 1885.

It seems to us that a minimum requirement as to cell area should be imposed and this minimum should be determined flexibly in relation to the amount of time individuals are to be kept in the cell. In Wolfish, the Supreme Court found no constitutional bar to keeping two detainees in a seventy-five square foot cell for seven or eight hours daily. 441 U.S. at 543, 99 S.Ct. at 1876. The Court recognized that the same space might be unconstitutional if used for many more hours of confinement. Recognizing that institutional determinations as **\*495** to the detainees' and the prison's needs will result in differing programs and amounts of time out of cell for safekeepers, it will be appropriate for more space to be allotted to the detainees who are required to spend more time in cells. Except where individual circumstances show the need for more restrictive confinement, safekeepers should be allowed to spend significant periods of each day out of their cells and some activities or programs should be regularly available to them in their time out of cells.

The court's consideration of incidents of tear-gassing of pretrial detainees by prison officials demonstrates deficiencies in both the finding of facts and the application of relevant law. Evidence before the court indicated six separate instances of a guard's use of tear gas, sometimes involving more than one pretrial detainee. The court's opinion considered only two of those instances, those of June 25, 1975 and of October 11, 1975. The court's only reference to other incidents was the statement "In both of these incidents and every other incident involving the use of tear gas reasonable force was used." 464 F.Supp. at 555.

Use of tear gas by prison officials was governed by a manual of correctional policies ([FN12]) applicable to the Indiana State Prison. Although plaintiffs argued that the instances of use of tear gas violated the departmental policy, the district court did not refer to that policy in its discussion of tear-gassing. Id. at 554-55. On April 21, 1975, Captain Park indicated in a memorandum to the prison warden that he had that day sprayed gas at three safekeepers. While safekeeper Malo's gassing was allegedly in response to his refusing to hand over an 18-inch long piece of pipe, the other two men who were

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

(b) Deliberate indifference entails something more than negligence, but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. Thus, it is the equivalent of acting recklessly. However, this does not establish the level of culpability deliberate indifference entails, for the term recklessness is not self-defining, and can take subjective or objective forms. Pp. 7-9.

(c) Subjective recklessness, as used in the criminal law, is the appropriate test for "deliberate indifference." Permitting a finding of recklessness only when a person has disregarded a risk of harm of which he was aware is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in this Court's cases. The Amendment outlaws cruel and unusual "punishments," not "conditions," and the failure to alleviate a significant risk that an official should have perceived but did not, while no cause for commendation, cannot be condemned as the infliction of punishment under the Court's cases. Petitioner's invitation to adopt a purely objective test for determining liability - whether the risk is known or should have been known - is rejected. This Court's cases "mandate inquiry into a prison official's state of mind," id., at 299, and it is no accident that the Court has repeatedly said that the Eighth Amendment has a "subjective component." Pp. 10-13.

(d) The subjective test does not permit liability to be premised on obviousness or constructive notice. Canton v. Harris, 489 U.S. 378, distinguished. However, this does not mean that prison officials will be free to ignore obvious dangers to inmates. Whether an official had the requisite knowledge is a question of fact subject to demonstration in the usual ways, and a factfinder may conclude that the official knew of a substantial risk from the very fact that it was obvious. Nor may an official escape liability by showing that he knew of the risk but did not think that the complainant was especially likely to be assaulted by the prisoner who committed the act. It does not matter whether the risk came Page III from a particular source or whether a prisoner faced the risk for reasons personal to him or because all prisoners in his situation faced the risk. But prison officials may not be held liable if they prove that they were unaware of even an obvious risk or if they responded reasonably to a known risk, even if the harm ultimately was not averted. Pp. 13-19.

(e) Use of subjective test will not foreclose prospective injunctive relief, nor require a prisoner to suffer physical injury before obtaining prospective relief. The subjective test adopted today is consistent with the principle that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief." Pennsylvania v. West Virginia, 262 U.S. 553. In a suit for prospective relief, the subjective factor, deliberate indifference, "should be determined in light of the prison authorities' current attitudes and conduct," Helling v. McKinney, 509 U.S. ___, ___: their attitudes and conduct at the time suit is brought and persisting thereafter. In making the requisite showing of subjective culpability, the prisoner may rely on developments that postdate the pleadings and pretrial motions, as prison officials may rely on such developments to show that the prisoner is not entitled to an injunction. A Court that finds the Eighth Amendment's objective and subjective requirements satisfied may grant appropriate injunctive relief, though it should approach issuance of injunctions with the usual caution. A court need not ignore a prisoner's failure to take advantage of adequate prison procedures to resolve inmate grievances, and may compel a prisoner to pursue them. Pp. 19-21.

2. On remand, the District Court must reconsider its denial of petitioner's Rule 56(f) discovery motion and apply the Eighth Amendment principles explained herein. The court may have erred in placing decisive weight on petitioner's failure to notify respondents of a danger, and such error may have affected the court's ruling on the discovery motion, so that additional evidence may be

this concern is misdirected. Bivens actions against federal prison officials (and their 1983 counterparts against state officials) are civil in character, and a court should no more allude to the criminal law when enforcing the Cruel and Unusual Punishments Clause than when applying the Free Speech and Press Clauses, where we have also adopted a subjective approach to recklessness. See Harte-Hanks Communications, Inc. v. Connaughton,                                            491 U.S. 657, 688 (1989) (holding that the standard for "reckless disregard" for the truth in a defamation action by a public figure "is a subjective one," requiring that "the defendant in fact entertained serious doubts as to the truth of his publication," or that "the defendant actually had a high degree of awareness of . . . probable falsity") (internal quotation marks and citations omitted).    That said, subjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment.

2

Our decision that Eighth Amendment liability requires consciousness of a risk is thus based on the Constitution and our cases, not merely on a parsing of the phrase "deliberate indifference." And we do not reject petitioner's arguments for a thoroughly objective approach to deliberate indifference without recognizing that on the crucial point (whether a prison official must know of a risk, or whether it suffices that he should know) the term does not speak with certainty. Use of "deliberate," for example, arguably requires nothing more than an act (or omission) of indifference to a serious risk that is voluntary, not accidental. Cf. Estelle, 429 U.S., at 105 (distinguishing "deliberate indifference" from "accident" or "inadverten[ce]"). And even if "deliberate" is better read as implying knowledge of a risk, the concept of constructive knowledge is familiar enough that the term "deliberate indifference" would not, of its own force,                                            preclude a scheme that conclusively presumed awareness from a risk's obviousness.

Because "deliberate indifference" is a judicial gloss, appearing neither in the Constitution nor in a statute, we could not accept petitioner's argument that the test for "deliberate indifference" described in Canton v. Harris, 489 U.S. 378 (1989), must necessarily govern here. In Canton, interpreting 42 U.S.C. 1983, we held that a municipality can be liable for failure to train its employees when the municipality's failure shows "a deliberate indifference to the rights of its inhabitants." 489 U.S., at 389 (internal quotation marks omitted). In speaking to the meaning of the term, we said that "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id., at 390; see also id., at 390, n. 10 (elaborating). JUSTICE O'CONNOR's separate opinion for three Justices agreed with the Court's "obvious[ness]" test and observed that liability is appropriate when policymakers are "on actual or constructive notice" of the need to train, id., at 396 (opinion concurring in part and dissenting in part). It would be hard to describe the Canton understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective.

Canton's objective standard, however, is not an appropriate test for determining the liability of prison officials under the Eighth Amendment as interpreted in our cases. Section 1983, which merely provides a cause of action, "contains no state of mind requirement independent of that necessary to state a violation of the underlying constitutional right." Daniels v. Williams, 474 U.S. 327, 330 (1986). And while deliberate                                            indifference serves under the Eighth Amendment to ensure that only inflictions of punishment carry liability, see Wilson, 501 U.S., at 299 - 300, the "term was used in the Canton case for the quite different purpose of identifying the threshold

for holding a city responsible for the constitutional torts committed by its inadequately trained agents, Collins v. Harker Heights, 503 U.S. ___, ___ (1992), a purpose the Canton Court found satisfied by a test permitting liability when a municipality disregards "obvious" needs. Needless to say, moreover, considerable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a governmental official. For these reasons, we cannot accept petitioner's argument that Canton compels the conclusion here that a prison official who was unaware of a substantial risk of harm to an inmate may nevertheless be held liable under the Eighth Amendment if the risk was obvious and a reasonable prison official would have noticed it.

We are no more persuaded by petitioner's argument that, without an objective test for deliberate indifference, prison officials will be free to ignore obvious dangers to inmates. Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. Cf. 1 C. Torcia, Wharton's Criminal Law 27, p. 141 (14th ed. 1978); Hall 115. We doubt that a subjective approach will present prison officials with any serious motivation "to take refuge in the zone between `ignorance of obvious risks' and `actual knowledge of risks.'" Brief for Petitioner 27. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, cf. Hall 118 ......................................... (cautioning against "confusing a mental state with the proof of its existence"), and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. Cf. LaFave & Scott 3.7, p. 335 ("[I]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it; but the inference cannot be conclusive, for we know that people are not always conscious of what reasonable people would be conscious of"). For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant official being sued had been exposed to information concerning the risk, and thus "must have known" about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant official had actual knowledge of the risk. Brief for Respondents 22.



Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an ....... ............. .................. ....... ........ obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health," Helling, 509 U.S., at ___, and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk. See Brief for Respondents 15 (stating that a prisoner can establish exposure to a sufficiently serious risk of harm "by showing that he belongs to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates"). If, for example, prison officials were aware that inmate "rape was so common and uncontrolled that some potential victims dared not sleep [but] instead . . . would leave their beds and spend the night clinging to the bars nearest the guards' station," Hutto v. Finney, 437 U.S. 678, 681 -682 n. 3 (1978), it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom. Cf. Helling, supra, at ___ (observing that the Eighth Amendment requires a remedy for exposure of inmates to "infectious maladies" such as hepatitis and venereal disease "even though the possible infection might not affect all of those exposed"); Commonwealth v. Welansky, 316 Mass. 383, 55 N.E.2d 902 (1944) (affirming conviction for manslaughter under a law requiring reckless or wanton conduct of a nightclub owner

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 04-11192-NMG

|  |  |
|---|---|
| Eric Kelley,<br>Plaintiff, Pro Se<br><br>v.<br><br>Sheriff DiPaola, Superintendent Norton,<br>Officer Thurman Hall, Sgt. Joseph Flynn,<br>Billerica House of Correction Legal Dept.,<br>Attorney Lee Gartenberg, Attorney John<br>Goggin, Commissioner of the Massachusetts<br>Board of Health, Commissioner of Public<br>Safety, and Billerica Board of Health,<br>Defendants. | **PLAINTIFFS MOTION FOR<br>AN INJUNCTIVE ORDER<br>NOT TO TRANSFER THE<br>PLAINTIFF TO A STATE<br>PRISON WHILE AWAITING<br>TRIAL.** |

**Now Comes,** The plaintiff in the above captioned matter, and respectfully requests that this Honorable **ORDER THE DEFENDANTS·** (who assert that they are a state agency). not to place the plaintiff in a state prison under the guise of 52§a M.G.L.A. as a pretrial detainee in a state prison setting.

The plaintiff completes his county term on March 31st. 2005, He has been told by (these) state correctional defendants that he will be sent to M.C.I. Concord awaiting trial as pre-trial detainee, in Suffolk matter <u>COM. V. KELLEY 03-10726.</u>

Respectfully;

_____

CERTIFICATE OF SERVICE
I sent the defendants a copy on_____ D.O.C. Nancy White Esq, Atty. Generals counsel Eva Badway.

Affidavit In Support Of
Motion For A Protective
Order (and Ruling).

I am Eric Kelley
the Plaintiff, and the following
is true;

1) I've Spent a total of 19 months
in State Prison while awaiting trial
as a Pretrial detainee

2) The defendants in their opposition
to my Motion for Summary Judgement
claimed that Since 1999 they became
a State agency.

3) The ⟨State⟩ classification Board
told me that after I completed my
House of Correction Sentence on March
31st.2005 I'd be "Sent to Concord
or Some State Prison To await trial"
on my current Pending criminal matter
identified as Comm. v. Kelley 03-10736
(Suffolk Superior)

Truthfully
Eric Kelley

*Exhibit B 4 pages*

COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF THE TRIAL COURT

*\* this Motion was Allowed*

Hampden, ss

Hampden Superior Court
Indictments 00-1511 1-6

COMMONWEALTH        )
v.                                )
DAVID TUTTLE              )

MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR REMAND TO HOUSE
OF CORRECTION

HAMPDEN COUNTY
SUPERIOR COURT
**FILED**

FEB 2 2 2002

*[signature]*
CLERK MAGISTRATE

## STATEMENT OF THE CASE

Defendant David Tuttle was transferred to MCI Cedar Junction from the Hampden County House of Correction on January 9, 2002, from the Hampden County House of Correction, where he was awaiting trial in this matter. His bail is $100,000, and he is not under sentence.

There is no Court order sanctioning Mr. Tuttle's removal from the House of Correction to MCI Cedar Junction. Mr. Tuttle is represented by the same attorney today as he has been since October 31, 2001, and no notice was ever provided to this attorney of any petitition to remove Mr. Tuttle to a correctional institution, either prior to his removal or since then. By motion, Mr. Tuttle seeks remand to a House of Correction.

## ANALYSIS

Chapter 276, Section 42 provides that persons charged with a crime shall be admitted to bail, and if not admitted to bail, committed to "jail for trial." Mr. Tuttle was committed to jail for trial on this matter, as he failed to post $100,000 bail.

There is a strong and historic legal framework under which confinement to state prison is limited only to persons who have been sent to prison appropriately. At least since *Jones v. Robbins*, 8 Gray 329 (1857), it has been recognized that a person confined inappropriately has an Article XII constitutional interest in being free from improper confinement.

The vitality of the *Jones* rule was reiterated in *Brown v. Commissioner of Correction & Superintendent, MCI- Walpole*. 394 Mass. 89 (1985). In *Brown*, a person convicted, upon District Court Complaints, of four counts of breaking & entering with intent to commit a felony, was confined to MCI-Walpole. The man was never indicted, simply convicted on District Court complaints, which was the basis of his successful objection to confinement in Walpole. It is significant that in *Brown*, the Commissioner argued that the *Jones* rule be limited to persons awaiting trial, an argument that was rejected by the Supreme Judicial Court. Mr. Tuttle is a person awaiting trial.

1

In 1971, the Attorney General was asked whether female prisoners awaiting trial could be kept at MCI-Framingham. (Chapter 125, Section 16 at that time mandated that female prisoners under sentence to a jail or house of correction would serve their sentences at MCI -Framingham.) The Attorney General's answer was no, relying on the plain language of Chapter 276, Section 42, which provides that persons not admitted to bail be committed to "jail for trial," and on Chapter 126, Section 4, which provides that "jails shall be used for the detention of persons charged with crime and committed for trial. " *Opinions of The Attorney General, 1971, Page 104.*

Mr. Tuttle is a person charged with crime and committed for trial; he is not under sentence. There is one mechanism, and only one mechanism, by which a person awaiting trial may be transferred from a jail or house of correction to a correctional institution. That mechanism is found in Chapter 276, Section 52A. The entire section is set forth below:

> "Persons held in jail for trial may, with the approval of the district attorney and shall, *by order of a justice of the superior court*, be removed by the commissioner of correction to a jail in another county, and said commissioner shall, at the request of the district attorney, cause them to be returned to the jail whence they were removed. *In addition*, such persons, if they have been under sentence for a felony, may, with the approval of the district attorney, be removed by the commissioner of correction to a correctional institution of the commonwealth, and said commissioner shall, at the request of the district attorney, cause them to be returned to the jail where they were awaiting trial. The proceedings for such removals shall be the same as for the removal of prisoners from one jail or house of correction to another. The cost of support of a person so removed shall be paid by the county whence he is originally removed. "

*Italics supplied.*
*Added by St. 1943, c 131. Amended by St. 1971, c 592, s. 1; St. 1973, c 514.*

No person in Mr. Tuttle's position may be sent to prison without an order of a Superior Court Justice, following a hearing.

The requirement of an order from a Superior Court Justice is expressed in the first sentence of Section 52A. No person may be removed without such an order. While persons described in the second sentence of Section 52A potentially face removal to correctional institutions in addition to other jails or houses of correction, there is nothing in the statutory scheme that would suggest that such persons are not entitled to the protection that they will not be removed without written order of a Superior Court Justice. Indeed, the predicate to the possibility of removal to a correctional institute is that the person must have been convicted of a felony; clearly this must be demonstrated to the Superior Court Justice who will be asked to issue the order of removal, in a hearing, and given the statutory scheme, the burden is on a moving party to request such a hearing

before any person awaiting trial may be removed, especially when removal is sought to a correctional institution, a harsher place by far than the traditional, pre-trial, jail. Nothing in Section 52A authorizes anyone to remove a pre-trial prisoner without an order of a a justice of the Superior Court.

The absence of a specific repetition of the phrase "by order of a justice of the superior court" in the second sentence should not be read to imply that judicial intervention, while mandatory if removal is sought to a different jail, is not necessary to remove a person to a prison. It would defy common sense, case law, and every statutory scheme to interpret any statute to suggest that a person has less of a liberty interest before being sent to prison than to jail. The second sentence of Section 52A begins "in addition," and the better reading of the second sentence is that "such persons" are entitled to the protection of the requirement of an order from a Superior Court Justice, after hearing, but that "such persons," after a hearing, may be sent to correctional institutions to await trial, where persons without felony convictions may only be sent to other jails or houses of correction. The determination that a person has been previously been convicted of a felony would, there is no other interpretation available, be made by a Superior Court Justice, after a hearing, before he or she wrote any order removing the accused to a correctional institution. Mr. Tuttle has had no such hearing, and no such order has been executed, nor sought, not by the District Attorney, not by the Sheriff, not by the Commissioner of Corrections, not by anyone.

## PROCEDURE

Under Chapter 126, Section 4, and Chapter 276, Section 42, there is a mandate that persons awaiting trial be held in a "jail or house of correction." Any attempt to hold a person such as Mr. Tuttle in a "correctional institution" must be initiated by an appropriate motion, following by a hearing in which it is established, to the satisfaction of a justice of the Superior Court, that the person sought to be removed has been convicted of a felony, and by a decision of a justice of the Superior Court, in his or her discretion, that removal to a correctional institution may occur.

Until and unless such a hearing is held, the Defendant, David Tuttle, may and should not be remanded to any correctional institution, let alone to MCI-Cedar Junction.

## FEDERAL ASPECTS OF MR. TUTTLE'S INCARCERATION STATUS

There are also federal rights implicated in the situation where a person is incarcerated improperly while awaiting trial. A person awaiting trial has liberty interests under the Fifth Amendment, and the right to counsel under the Sixth Amendment, that distinguish his situation from that of a person under sentence, who is largely confined to his rights under the Eighth Amendment.

3

That a person awaiting trial has a greater interest in being near home than has a person under sentence was recognized in *Cobb v. Aytch,* 643 F2d 946 (3rd Circuit, 1981). *Cobb* was a Section 1983 class action on behalf of two classes of persons charged with crimes in Philadelphia, who were incarcerated away from Philadelphia in another part of Pennsylvania. One class was under sentence, the other awaiting trial. The Third Circuit held that the burden of justification on the part of the government was much higher with regard to the class awaiting trial.

Closer to home, the Second Circuit recognized that where a state by statute or regulation prescribes mandatory procedures to govern administrative segregation among persons incarcerated, any person so incarcerated has a liberty interest in remaining in the general prison population. *Covino v. Vermont Department of Corrections,* 933 F 2d 128 (Second Circuit, 1991). The liberty interest of Mr. Tuttle in being held at a jail or house of correction pending trial is regulated by Chapters 126 and 276, and Mr. Tuttle has the right to demand that the Commissioner of Correction, and the Hampden Sheriff, comply with existing laws governing his incarceration. In *Covino,* when the prison moved Mr. Covino from his single cell to accomodate a handicapped prisoner, he insisted he wanted any single cell rather than be in a double cell. Prison officials gave him a single cell, but the single cell was in a segregation unit, and no rules were followed before sending him to segregation! A federally cognizable violation of a civil right was also recognized in *McMillian v. Johnson,* 88 F 3rd 1554 (1996). There, an inmate awaiting trial was sent to await trial on Death Row!

Mr. Tuttle, awaiting trial and not under sentence, thus has federal constitutional rights at stake as well.

## REMEDY AND CONCLUSION

Defendant prays to remand to a House of Correction in the general vicinity of Hampden County, until and unless a Superior Court Justice, after hearing, permits removal by a written order of the Court, after an opportunity for Mr. Tuttle to be heard in opposition to any request to remove him to any correctional institution.

February 22, 2002

David Tuttle
By His Attorney

Edward C. Bryant, Jr.
BBO #062130
1242 Main Street
Springfield, MA 01103-1953
(413) 737-8575

4